Green, J.
delivered the opinion of the court.
This bill is brought by the complainants against the defendant for an account of his trust as executor. The bill was filed in 1819, and in 1822, no answer yet having been filed, the cause was continued by consent of the parties to await the decision of a suit then pending against the defendant as executor of Peter Turney, deceased. In 1832, on motion of the complainants, the defendant was required to file his answer, the said suit to await the de- *209 cisión of which it was continued, not yet having terminated. The cause was then, in the course of the court, brohght to a hearing, and finally determined at the last term of the chancery court at Carthage, from which decision this appeal is prosecuted.
The bill sets forth the property that came into the hands of the complainant, and prays for an account generally. To this bill the defendant answered, setting forth the manner in which he had administered the estate, the credits to which he is entitled for disbursements, and relies on two settlements made by him with commissioners appointed by the county court of Smith, the one in 1808, and the other in 1814, by which it appears that the estate was, in 1808, in arrears to him the sum of three hundred and eighty-three dollars forty-three cents, and in 1814, the sum of three hundred and ninety-one dollars ninety-six cents, and insists that these settlements ought to protect him to the extent of the matters included in them. Peter Turney died in 1804, having made his will, in which the defendant and William Martin were appointed executors. Martin renounced, and the defendant alone qualified. By the will several tracts of land are devised to be sold for the payment of debts, and the balance of the property was devised to Frances, the relict of the testator, during her life or widowhood, for the purpose of raising and educating the children; and on her death or marriage, it was to be divided among the complainants, either by sale or division, as might seem best to the executor. Frances, the widow, married Thomas Pharis in 1807, and shortly thereafter the defendant took into his possession and sold the negroes and the whole of the personal estate then undisposed of. No inventory of the estate was ever returned to the county court by the executor. The settlement with commissioners in 1814, exhibits disbursements by the defendant of an excess of three hundred and ninety-one dol *210 lars ninety-six cents over and above all the- estate which? had come into his hands.
1. The first question tobe considered is, whether these settlements are a bar to the claim of the -complainants for a general a¿count. This court decided, in the case of Stephenson vs. Stephenson and Yandal, (3 Haywood, 124,) that these ex parte settlements with comr missioners appointed by the county court were not even prima facie evidence against a distributee or legatee. This was probably going too far, and this decision, doubtless, produced the act of 1822, ch. 31, sec. 2, by which it is declared, that settlements made by executors and ad-, ministrators with a committee of the county court shall, when made, be received as prima facie evidence for such executor or administrator. Perhaps this will be-the safe doctrine to adopt even in relation to settlements which were made before the passage of the before mentioned act. An executor or administrator who acts legally, and returns an inventory of all the estate which may have come into his hands, thereby furnishing the legatees or distributees with full and ample testimony of record, of the amount of their ancestors estate, and who honestly, vigilantly and faithfully administers the effects which may have come into his hands, ought to be protected by his settlement with the county court, so far, as to throw the burthen of proof upon those who question the correctness of his conduct. But the counsel for the defendant insists that such settlement is to have the force and effect of a settled account, and can only be opened by a bill brought to surcharge and falsify! To support this position the decision of this court in the case of Burton vs. Dickerson, (3 Yerge'r’s Reports, 112,) is quoted and relied upon. It will be seen, by looking into that case, that it has no resemblance, scarcely, to the present. From the report of the case, it appears that “when the settlement took place, the complainant, Burton, was then in North Carolina, (where he then *211 lived.) But a few months before„the division he was in Tennessee and the administrator requested him to stay until the settlement took place. This he de-dined. But he appointed Matthias B. Murfree, a brother of his wife, and also a distributee, his agent, to receive whatever share might be allotted him. After allotting the negroes and .dividing the land, according to the above principle, there was one hundred and thirty-six dollars forty cents due in money, which Matthias B. Murfree received, as agent for the complainant, and gave a receipt therefor, dated 24th August, 1814. The negroes allotted to complainant were also delivered to him as agent.” By the above extract from the case it will be seen that this was in effect a settlement between Burton, the complainant, and the administrator. The estate had been managed with scrupulous integrity, and settled with punctilious honesty and fairness. Dickerson, the administrator, “requested Burton to stay until the settlement took place.” This he declined doing, but appointed his brother-in-law, who was also a distributee, his agent. This agent, who was equally interested with the complainant, superintended the settlement .while in progress, and received the negroes and money to which, by the settlement, Burton was entitled. The commissioners were, in that case, merely agents of both parties. These settlements, where the distributees are of age, and attend before the commissioners, having it in their power to dispute items, and require full proof, and thus probe the accounts of an administrator, ought, in reason, to have the same force and conclusive character that belongs to a stated account. It will be seen, by reference to the opinion of the court, that this was the view in which the remarks are made, which have been pressed by the counsel for the defendant as of conclusive authority in this case. The court says: “There is no fraud; it is even doubtful if there-were any mistakes; and were the court to open this account, it would set a precedent like- *212 to disturb the repose of the country, and to endanger J ,, . . r , greatly the situation of the most iaithrul administrators. This was unquestionably a settled account within the authorities. The receipt of complainant, by his agent, Matthias B. Murfree, recognized it as such, and this bill came greatly too late to call it in question.” Here the court plainly give the reason why it is a settled account “within the authorities;” because “the receipt of the complainant, by his.agent, recognized it as such!” The very reason given, and wh^ch more fully appears by the statement of the case, why that was to be regarded as a stated account, would evince that a case like this could not be so regarded. In this case, none of the plaintiffs were present when either of these settlements were made, and they were all, or nearly all, infants, when even the last settlement was made.
The case of Burton vs. Dickerson, therefore, is not in the way of the account prayed for in this bill, and it has been thus particularly referred to that the misapplication of it to this case may be plainly seen. The doctrine of that case is in accordance with .the opinion of Chancellor Kent in the case of Evertson vs. Tappan, (5 John. Ch. Rep. 511,) where he held, that an account taken'under an ex parte order could not be binding upon infant plaintiffs; “but as the father of the infants attended before the master, as their guardian, during the whole progress of the taking the account, it does not seem to me necessary to open it further than to correct such errors as have now been pointed out on the part of the plaintiffs.”
From what has been said, it results, that where the parties interested attend the commissioners during the settlement of the accounts, having an opportunity of objecting to any improper allowance, and, by the act of 1822, have the right of contesting the report, and of appealing to the circuit court; if, under these circumstances, they agree to the settlement, it is made in effect their own, and should have all the force and effect of a stated *213 account. But where the parties are infants, as in this ... .. . . , case, and without guardians; where no one attends before the commissioners, and the order and settlement, as in the present instance, is wholly ex parte, it is going far enough to say that they shall only be prima facie evidence against the distributees, and liable to be opened and reviewed by a bill asking for an account generally. To say that distributees under such circumstances, must surcharge and falsify by their bill, and that the account can only be opened so far as errors are pointed out and shown by the bill, would be most absurd. They have had no knowledge of the accounts; they do not know by what evidence the items were supported; they are often unable to obtain other evidence than that which they may extort from the executor on his oath. And shall they be deprived of the benefit of that, because they cannot point out the items improperly allowed him, and shall this severe rule be permitted against a parcel of infants without guardians, and in favor of an executor whose accounts abound with gross errors, and who returned no inventory of his testator’s estate? Surely not.
2d. The next inquiry, is, upon what principles the account ought to have been taken, and whether this executor ought to have been charged with interest. Formerly, executors were not charged with interest, but ever since the time of Lord Thurlow, they have been held liable to pay interest, according as the circumstances of each case may justify. Interest is not chargeable against them as a matter of course. When the exigencies of an estate require an executor to keep money by him; where he has not unreasonably delayed a settlement of his accounts; where he has made, promptly, a just and true exhibition of the receipts and disbursements, he is not to be charged with interest on any accidental amount he may have had in his hands, and upon which he received no interest. 3 Dess. Eq. Rep. 241: 13 Mass. Rep. 233: Jer. Eq. Juris, 144-5-6. But on the other hand, *214 if an executor makes interest, he is chargeable with ity and as the fact, whether he has actually received a profit from the estate or not, can scarcely ever be directly proved, courts of chancery have adopted certain rules, by which, from the existence of given facts, it is presumed that a profit was received by the executor. The authorities above quoted, and which are relied on by the counsel for the defendant, show, that where an executor uses the money of the estate for himself; where he keeps the money by him without a reasonable ground for doing so; where by long delay in settling his accounts, the use of the money by him may be inferred, in all such cases interest will be charged. This rule is not adopted with a view to punish an executor or trustee, but with a view to reach the profits, which, from these facts it is to-be presumed he may have made. 1 John. Ch. Reports, 510, 620: 1 Vesey, 247: 4 Vesey, 620: 7 Vesey, 124: 3 Dess. 244. In the case of Schieffelin vs. Stewart and others, (1 John. Ch. Rep. 620,) Chancellor Kent reviews the English cases upon this subject, and lays down the rule that an executor or other trustee, is not allowed to make gain or profit from the use of the funds committed to him in trust, that if he negligently suffer the moneys to lie idle, he is chargeable with simple interest, but if he convert them to his own use, he is chargeable with compound interest. And this is the only possible way of reaching the profits which the executor or other trustee may have made. If the moneys are retained a length of time in his hands, when the exigencies of the trust did not require it, the inference is irresistible, that the fund has been so retained that it might be employed for the private benefit of the trustee; and, if upon that presumption, he could not be charged with interest, an executor could easily make an estate worth more to himself than to the legatees, especially if they were young when the estate might come into his hands. Such a consequence could not be tolerated by any principle of justice.
*215 We come now to the facts of this case, to see how the principles above laid down are to be applied. By the settlements both of 1808 and 1814, made by the executor before commissioners appointed on his ex parte application, nominated, doubtless, by himself or his attorneys, he exhibited accounts and vouchers, and got them allowed him, by which it appeared that the estate was considerably in arrears to him. These settlements of themselves contain, on his part, a direct claim of right to all the moneys of the estate then in his hands. Now, as in truth, when the settlement of 1808 was made he had near a thousand dollars belonging to the estate, then undis-bursed; and at the settlement of 1814, near .two thousand in like condition; the settlements showing the estate to be indebted to him, furnish conclusive evidence that he was employing these sums for his own use. This fact alone, upon the best settled principles, is sufficient to authorize the court to charge him with interest. But almost every other ground laid down in the books why an executor should be charged with interest exists in this case. He kept the money by him without reasonable ground for doing so. It is said, there were many suits pending against the estate, and that its exigencies required the fund to be retained in the executor’s hands. This is a mistake. In the list of suits exhibited by the defendant’s counsel, eleven in number, there are only three that were undetermined after 1808, which required the application of any of these funds, and the demands then set up in these suits fell very far short of the amount of funds in his hands. The case of Wilson Cage is put down at seventy-three dollars, as having been paid in 1814. The case of Young and Arnold, three hundred and seventeen dollars; and in the case of Sarah Greer there was originally claimed only about three hundred and fifty dollars. The case of Esther Ballow, if the estate should have been liable for it at all, ought to have been settled by him immediately on his becoming execu *216 tor, for he had agreed with the testator to fulfil the con-«it! riii ti act with her by a conveyance or the land.
From this view of the case, it is apparent that the ex-igenc.ies of the estate did not require that the executor should retain the monies in his hands. But there is no pretence for the assumption that the fund was retained to' answer the exigencies of the estate, when it is recollected that the executor, by his settlements with the county court, and by his answer in this case, claims the fund as his own, by denying that he was in arrears to the estate. This is inconsistent with the pretence that the fund was kept on hand, to answer the exigencies of the estate. But he now urges, as a reason why he ought not to pay interest, that the legatees were infants, and had no guardian, so that there was no one to whom he could legally or safely pay it. To this argument there are several sufficient answers. In the first place, the answer negatives the idea that he was holding the money unemployed in his hands, awaiting the appointment of a suitable person to receive it. In the next place, the executor had exhibited to the court, whose duty by law it was to appoint guardians for these orphans, accounts and vouchers, from which it appeared, by the reports of their commissioners, that the estate was wholly insolvent. We are bound to believe, that if the executor had procured such settlements, and statements of the receipts and disbursements of the estate, as would have been warranted by the truth, showing a large balance in his hands, that the county court of Smith would have done its duty, and appointed guardians. But why appoint guardians, when he had made it appear that such an appointment would have been an idle ceremony. When we receive these settlements, and compare them with the master’s report, and with the admissions at the bar, thé claim to exemption from the payment of interest, which is urged on the ground that there was no guardian, furnishes a striking evidence of the influence men’s interests have on *217 their judgments in perverting them from a just conception of truth and justice.
But, in the last place, a sufficient answer is contained in the language of Chancellor Kent, in Dunscomb vs. Dunscomb, (1 John. Ch. Rep. 570) where he thus obviates the objection of a party making a similar claim to exemption from interest: “The executors say, it has always been kept in readiness to pay the persons entitled, when demanded. But this is no sufficient excuse. If they had met with any real doubt or difficulty as to the person authorized to receive, they could have applied to the court for advice, or brought the money into court.” So it is here. If this executor had desired to pay the money out of his hands, and discharge himself from paying interest, he could have brought the money into court, and he would thereby have assured the appointment of guardians to receive the money, and execute bonds as required by law.
It is further urged, as a reason why interest ought not to be charged, that, although there were very great mistakes in the settlement made with the county court, yet there was no design on the part of this executor to claim any thing unjustly; and that he has retained the money under a misapprehension of his rights, honestly supposing that it was his own.
The explanation given by counsel, as to the manner in which the gross error of $1,333 50 was introduced into the settlement of ISOS, is plausible, and may be true, as it is shown in proof, that the widow settled that $1,333 50 claim, by the payment to Haynes & Arnold of $700, it may be that when the settlement was made in 1808, he had no evidence of the payment, other than the remittitur he found of record. This supposition, however, is contrary to the evidence of the widow, who says she told the defendant of the arrangement she had made, and that he expressed himself well pleased. But, be that as it may, when he was making the settlement in *218 1814, and then produced the receipt the widow had taken for the payment of the $700, and asked to be allowed for that, surely he ought to have remem bered the $1,333 50, which had been allowed him in 1S08, for the same claim; and to have then corrected the mistake. But so far from doing so, he retains the allowance for both the sums, and insists, in his answer, upon all the allowances made him in these settlements. When we consider the amount of the sums claimed, sufficient to have attracted the defendant’s attention, and to have fixed them upon his memory; and when, in connection with this prominent error, the amount claimed in both these settlements, so greatly beyond the true amount due, is also considered, it must be confessed, that if the defendant thought himself entitled to it, his interest must greatly have perverted his sense of justice. The facts of this case have no analogy to the case in 12 Vesey, 385, which was relied on in support of this argument. There the executor was-in justice entitled to the sum retained; but he could not be allowed it, because he did not claim it in time.
It is further insisted, that the defendant ought not to pay interest from the time this cause was continued by consent in 1822, until the order was made in 1832, requiring the defendant to file his answer. It is said, that during that time he retained the money by the consent of these legatees.
At the time this continuance was agreed upon, the parties were litigating the matter of this bill, at arms’length. The complainants had alleged that the defendant was largely in arrears to the estate, and the defendant had constantly denied that Ije owed it any thing. It could' not, therefore, have been an agreement that he should retain the money; for before such an agreement could exist, it must have been admitted that there was money in his hands, upon which the agreement for him to retain it might be predicated. But as that fact never was admitted by the defendant, the ¡continuance did not *219 amount to an agreement that he should retain the money, and be discharged from the payment of interest. It could, in fact, have no other effect than a continuance in any other case, where neither party is ready to try, would have. Yery different is the situation of a trustee, who admits that money is in his hands, and who retains it by the express consent of the cestui que trust. In such case it would be most unjust that he should pay interest for the time he might so retain it.
3d. As, from the view of the case which has been taken, it is believed there cannot be a doubt but that the defendant should be charged with interest, we. come next to consider in what mode it ought to be calculated. It is argued by the complainants’ counsel, that the defendant, under the circumstances of the case, ought to be charged with compound interest. It must be admitted, that were the rule laid down by Chancellor Kent (1 John. Rep. 620) tobe rigidly applied to this case, it would be difficult to distinguish this case, in principle, from those where compound interest has been allowed. It is true, the defendant did not speculate in stocks with the money of complainants, nor vest, it in merchandise; but it is equally true, that he used it as his own; concealed from them the knowledge that he had any in his hands, and claimed it as his own. It is also true, that he was an extensive dealer in lands and land warrants, and that no investiture of money has been more profitable than that in which he was employed from 1804, when he became executor, until 1808, in the acquisition of lands in Tennessee. Five thousand acre tracts, lying in the Indian boundary, were procured, about that period, for five hundred dollars, which are now worth forty or fifty thousand. If the defendant was a judicious dealer in lands, and land warrants, no rule, even of compound interest, which a court of chancery ever has adopted, would reach the probable-profits, which may have been realized by him, from the investiture, in that description of property, of the sums *220 belonging to this estate, and retained in his hands. But no case in Tennessee has gone so far upon this subject as the complainants insist the court ought now to go. We will not, therefore, circumstanced as the court now is, go beyond the rule adopted by the chancellor; that is, allowing interest on the balances in the executor’s hands.
Great astonishment is expressed at the amount of interest, which the master’s report presents, in comparison with the balance of the principal on hand. This astonishment will cease, when it is recollected that the money has been in his hands along time, from twenty-five to thirty years; and that the sum in 1809 was a very considerable one which was in his hands; and that it has been but gradually diminished, by disbursements, up to this time.
4th. We next come to consider of the account; and here, after the most attentive consideration of the matters of exception on both sides, we find very little, in which our minds are inclined to differ from the chancellor. Indeed, this account seems to have been scrutinized with the utmost vigilance; to have been most carefully and patiently made up, and to have been adjusted with the ability, and enlightened sense of justice, which distinguish the chancellor who reviewed it. It has been before the chancellor four times; and the facts and circumstances calculated to throw light ori the subject of every exception seem to have been thoroughly investigated. There are some allowances for services which were not strictly legal, but which, in justice, an executor ought to have; and which are in accordance with an act of assembly passed since these services were performed. The account, therefore, will not be changed in that respect.
The only items which have given us any difficulty, are, the claim of $131 00 by the defendant for costs, paid in the Young and Arnold suit; and the allowance made to the defendant, of five hundred dollars, paid Mrs. *221 Ballow. We are not entirely satisfied with either of these items. The defendant was certainly liable for these costs; and the only question is, has he been allowed for this sum in either of the other items allowed him on account of the Young and Arnold suit. The chancellor thought he had, and we strongly incline to the same opinion. We do not find any evidence in the re-, cord, that more than three hundred dollars was ever, decreed against the defendant in that suit, besides the $131, the costs in equity, and the $17 00, the costs at law. He has been allowed on account of this suit, in one item $432 00, and in another $144 00. This amounts to more than all those sums added together. The records of the court in which the suit was tried were accessible, and since this item was in contest, the deposition of the clerk has been taken. The proof could have been made plenary on this point; but the defendant has chosen to rely upon the receipt of the clerk, expressing that the $144 00 was for the decree- in the suit of Williams vs. Young and Arnold. The language is equivocal; and under the circumstances, this item is rendered too suspicious to be allowed, by the mere production of the execution for that amount of costs.
As to. the Ballow item, there is too , much uncertainty about the assumption, that the Taylor bond covered the one hundred acres sold by the testator to Mrs. Ballow, to hold the defendant responsible for the 'damages it is supposed he ought to have recovered from Taylor. We do not think, either, that there is a reasonable presumption that Turney paid the defendant for this one hundred acres of land in his lifetime. It is true, Colonel Martin proves that the parties had agreed about it, six years before Turney’s death; but if Turney had paid the defendant, it is likely he would have taken up his bond, and caused the defendant to have executed his own to Mrs. Ballow.
The greatest difficulty is as to the amount. The de *222 fendant ought to have settled this with Mrs. Ballow so soon as he became executor; and to have retained the amount Turney had agreed to give him. Its value, Col. Martin says, was three hundred dollars, when Turney and Williams agreed about it. Strictly, that sum and interest, from 1798 to 1806, is all he ought to have charged. However, as the chancellor allowed the whole $500 00, which was paid, we will not disturb it. Let the decree be in all things affirmed.
Decree affirmed.